[No. 1816.]

STEVE MURPHY v. THE STATE.

1. CIRCUMSTANTIAL EVIDENCE — CHARGE OF THE COURT. — When the case of the State rests alone upon circumstantial evidence, it is the imperative duty of the trial court to give in charge the law controlling such evidence.

2. THEFT — CHARGE OF THE COURT. — The defendant in a theft case introduced evidence tending to show that he purchased the alleged stolen animals. Under such circumstances the trial court should have charged the jury that if they believed from the evidence that the defendant purchased the hogs, or if the evidence in support of such theory produced a reasonable doubt in their minds that the defendant stole them, they should acquit.

APPEAL from the District Court of Lavaca. Tried below before the Hon. George McCormick.

The conviction was for the theft of hogs of the value of $78, in Lavaca county, Texas, the hogs being the property of James Lee, on the 1st day of August, 1882. A term of two years in the penitentiary was the punishment awarded.

James Lee was the first witness for the State. He testified that he was the owner of the hogs alleged in the indictment to have been stolen. The animals disappeared from their accustomed range in Lavaca county, Texas, on or about the 1st day of August, 1882. No one had the consent of the witness to take the said animals. Witness made diligent search throughout the neighborhood for the hogs as soon as he missed them, and in the course of that search called at the house of Mr. James Brown, who lived about a mile and a half from witness's house. He found Mr. Brown at home. The defendant, who had lived at Brown's for five years, was also present. Witness asked them if they had seen anything of the animals, describing them as a bunch of thirteen, all black except a blue barrow. Both Brown and the defendant assured witness that they had seen nothing of them. Defendant remarked during the course of the conversation that he was going to Cuero in a few days, and would keep a good look out for them. Witness replied that if he would do so and find them, he, witness, would pay him $10. He said: "All right; I will look for them." The defendant had lived in the range of these hogs for over five years, working with James Brown, and was familiar with them.

About the 1st of the succeeding September, the witness heard of his hogs about eighteen or twenty miles distant from their range. In company with Sheriff Smothers, Bill Smothers and Tom Willis, the witness went to the place indicated to him. They nooned on Supple Jack creek, and, soon after they left that point, witness saw one of his hogs run from the road into the brush. A short search in this immediate vicinity resulted in the discovery of eight head of the missing hogs. The party rallied them with a dog, and part of them left, going towards Leo McClanahan's, whither Sheriff Smothers and Tom Willis followed them. Witness and Bill Smothers remained to watch the hogs that still kept cover in the thicket. While watching at this point, witness and Bill Smothers saw a man riding about at a short distance, and acting strangely. After a time this man rode up to the thicket and asked witness what he and Bill Smothers were doing. Being told, he said that he claimed the hogs, and that if permitted they would go directly to his house. The hogs were permitted to leave the thicket and they started towards the house of this man, who proved to be Leo McClanahan.

Witness asked him how he came by the hogs, and he replied that he bought them. Witness then asked him from whom he bought them, and McClanahan refused to reply. He refused to reply to this question several times,— as often as it was repeated.

Witness, Bill Smothers and McClanahan then went to the latter's house, and found Sheriff Smothers and Tom Willis with the hogs they had followed from the thicket. Witness then claimed the hogs as his property, and proposed to take them. McClanahan replied that witness would have to swear to them before he could get them. In order to do this the presence of a magistrate was deemed necessary, and Bill Smothers and McClanahan went for justice Pat May. May arrived during the evening, and after transacting the business with which he was charged, he told McClanahan that since he was "into it," he had best tell from whom he had bought the hogs. After supper McClanahan exhibited a bill of sale of eleven hogs, purporting to have been executed by the defendant. McClanahan finally consented that the witness should take the hogs, and the witness drove them home. These animals were worth from $3.50 to $5 per head; those recovered were worth at the very least $36. One of the animals not recovered was a pig; the others were eight and ten months old. When lost, the hogs were in the witness's mark, and the marks had entirely healed. That mark, on the hogs recovered, had been recently altered, and the alteration had not healed. On some of the animals recovered, the mark on both ears had been changed.

John Holster was the next witness for the State. He testified that, at the time of the alleged theft of the hogs designated in this indictment, he was living on his place near the line of Lavaca and De Witt counties, and about eighteen or twenty miles distant from Hallettsville. Witness had rented his place to a man named Tucker, but, not having yet finished gathering his crop, he had not moved off. He left the place within three days after Tucker took possession. The witness left his place one evening about sundown to spend the night elsewhere. There were no hogs about the place when the witness left on that evening. When he returned next morning about sunrise, to continue gathering his corn, he saw a wagon, covered with plank, standing near the house. Witness looked into the wagon and saw that it contained a lot of thirteen hogs, all black but one — a blue one. The defendant and Tucker were at the house. While witness was looking at the hogs, the defendant came to him and proposed to help witness gather corn until noon if witness would help him mark the hogs. Witness agreed. They backed the

wagon up to the hog-pen and proceeded to mark the animals. Tucker took out the back wagon-gate and stood at it to keep the animals from getting out. Defendant held the hogs as they were taken out singly, and witness marked them, or rather, changed the old mark. When he commenced he asked defendant how he should make the change. Defendant said that if witness would cut a slope in one ear it would make his mark. Witness changed the mark as directed. These animals were brought to the witness's place during the night, some time in August, 1882. Witness had never seen the hogs before and knew nothing about them. He could not now remember the original marks. The animals were put in a pen which rested on a neighborhood road, which was in plain view of persons riding along said road. Witness left that evening, going west, and could not say how long the hogs were kept in the pen.

Arch Smothers testified, for the State, that he was sheriff of Lavaca county when Lee lost his hogs, and was with Lee when he found them in McClanahan's possession. Defendant fled the country immediately after the hogs were found, and could not be apprehended after diligent search. He was arrested by witness some time afterwards in Hays county.

Leo McClanahan was the next witness for the State. He testified that he lived very near the John Holster place, and was at Holster's place every day, going there to get water. On or about the day of the alleged offense, witness went as usual to Holster's place to get water. He there saw a lot of hogs in a pen that rested immediately on a neighborhood road. These hogs remained in the pen some three or four days to the witness's certain knowledge, and the witness once saw them down the creek, in the custody of the defendant. Defendant told the witness that he owned the hogs, but did not say from whom or how he got them. Witness bought eleven head of these hogs from the defendant, and afterwards sold three of them for $10.50. He sold the three head to Marion Hagan. The defendant gave the witness a bill of sale to the animals,— the same which has been produced in court. Witness wrote this bill of sale, and inserted the word " we " because he expected Tucker to sign the bill with the defendant. When asked to sign the bill of sale Tucker refused, saying that he had nothing to do with the hogs.

The hogs had been freshly marked when witness first saw them in the pen, and their ears were still bloody. The defendant kept the hogs on the range down the creek after he took them out of the pen, but did not stay with them all of the time. Witness met defendant once between the range on which the hogs were

then kept and Holster's place. Of the eleven hogs the witness bought of the defendant, one was blue and ten were black. The defendant brought the hogs to Holster's place; at least the witness never saw him at that place until the hogs were brought there. Witness bought these hogs from the defendant in Lavaca county some time in August, 1882. He did not know where the defendant got them. The witness had the hogs in his possession when Lee claimed and recovered them.

James Brown was the first witness for the defense. He testified that he lived about a mile and a half distant from James Lee's house. Some time in July, 1882, the defendant came to witness to borrow $20, for the purpose, he said, of buying hogs. Felix Tucker was on the place at that time. Witness loaned the defendant $18.50, telling him that he had no more money convenient. This transaction took place on the gallery of witness's house. Defendant immediately left the gallery, and witness saw him a few moments later talking to Felix Tucker, and saw him give Tucker some money. Witness was not near enough to hear the conversation between the parties, but knew that defendant paid Tucker the money for hogs. He did not hear their conversation, but knew that they were talking, and he plainly saw the defendant give Tucker some money. When witness went out to his lot, later on that day, he saw some hogs in his pen. He did not know how the hogs got there, nor did he count them, but remembered that they were black in color. The animals described remained on witness's place several days. Defendant wanted witness to take them on shares, but witness refused.

After having kept the hogs on witness's place several days, the defendant borrowed witness's wagon and team to take them away. Witness could not, of his own knowledge, say where the defendant took them to. He left the witness's house about 3 o'clock in the evening and started down the Cuero road, but broke a single-tree and returned for another. The witness did not see the hogs when they were being penned on his place, and did not know who penned them there. As a matter of fact, the witness paid but very little attention to the hogs, as he was suffering at the time from lameness. The witness's pen, in which the hogs were confined for several days as stated, was on the Cuero public road, in plain view of all travelers.

Witness was at home when Lee came to his house, hunting his hogs. Lee described his hogs when he asked about them. The defendant was then present. This visit of Lee's was made to the witness's house before the hogs were placed in witness's pen, and before witness saw them. Witness, as stated, paid no attention to

the hogs after they were penned on his place, and the reason he did not notify Lee afterwards was that he, himself, thought no more of the hogs after he first saw them. The defendant had, at the time of the alleged offense, lived at witness's house and worked for him a number of years. Witness owned hogs, and had a hog mark. He did not know Lee's hog mark. Defendant married the widow of the witness's brother.

The motion for new trial assailed the charge of the court, and denounced the verdict as unsupported by the law or the evidence.

*A. P. Bagby,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

Hurt, Judge. This is a conviction for theft of hogs. There are two errors in the charge of the court. 1st. This is a conviction resting solely upon circumstantial evidence. The court should have given in charge to the jury the rules applicable to such a case.

2d. Defendant introduced evidence tending to prove that he purchased the hogs. The court should, in its charge, have called the attention of the jury to this defense, by informing the jury that, if they believed from the evidence that defendant purchased the hogs, or if the evidence in support of the purchase produced a reasonable doubt in the minds of the jury that defendant stole the hogs, they should acquit.

Because of these omissions in the charge of the court, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered March 19, 1885.]